IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 1, 2018

## IN RE SETH MC. ET AL.

**Appeal from the Juvenile Court for Dickson County**
**No. 04-17-051-CC      Michael Meise, Judge**

_____

### No. M2017-02562-COA-R3-PT

_____

A mother of four children had her parental rights terminated based on the grounds of abandonment by failure to support, abandonment by failure to provide a suitable home, abandonment by wanton disregard, substantial noncompliance with permanency plans, severe child abuse, and persistence of conditions. Mother appealed the trial court's judgment. We affirm the termination of her rights as to all grounds other than abandonment by failure to support, abandonment by failure to provide a suitable home, and persistence of conditions.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed in Part, Reversed in Part, and Vacated in Part**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which J. STEVEN STAFFORD, P.J., W.S., and JOHN W. MCCLARTY, J., joined.

Taylor Reigh Luther, Dickson, Tennessee, for the appellant, Ashley R.

Herbert H. Slatery, III, Attorney General and Reporter, and Jordan Keith Crews, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

## OPINION

### I. FACTUAL AND PROCEDURAL BACKGROUND

Ashley R. ("Mother") is the mother of Seth Mc. (born in 2007), Bentley Mc. (born in 2012), Kaitlynn R. (born in 2015), and Morgan R. (born in 2016).[1] On February 23, 2016, the Department of Children's Services ("DCS" or "the Department") received a

---

[1]The children's fathers have waived their parental rights and are not parties to this appeal.

referral alleging that the older three children were being exposed to methamphetamines. Mother may have been pregnant with Morgan at this point. DCS subsequently located the children at their maternal grandmother's house and arranged for two of them to undergo a hair follicle test. The children tested positive for methamphetamines and amphetamines.

The Department filed a petition on March 29, 2016, to adjudicate the dependency and neglect of Seth, Bentley, and Kaitlynn, and to transfer temporary legal custody of the children to DCS. The trial court issued an ex parte protective custody order that same day, finding there was probable cause to believe the children were dependent and neglected, and DCS placed the children with Mother's aunt. The Department prepared a Family Permanency Plan on April 25, 2016. Mother signed the permanency plan and acknowledged that she had received a copy of the "Criteria and Procedure for Termination of Parental Rights."

Mother attended in-patient treatment in April and May 2016 and successfully completed the program. One of Mother's discharge recommendations was to attend ninety sessions of Alcoholics Anonymous in ninety days. Mother testified that she attended only "a couple" of meetings.

The trial court held a preliminary hearing on June 29, 2016, to consider DCS's dependency and neglect petition. Mother's attorney was present for the hearing, but Mother was not. The court wrote in its order that Mother "reportedly finished her rehab in early June, visited with the children one time and has not been heard from since." The DCS representative informed the court that Mother was not in contact with DCS and asked the court to disallow further visitation of the children by Mother at that time. The trial court ordered that the children would continue to be in the temporary care and custody of DCS and that Mother would have no contact with the children pending further orders of the court.

The trial court held an adjudicatory/severe abuse hearing on October 19, 2016. Mother was present for this hearing and stipulated that the children were dependent and neglected on March 29 when they were removed from her home. The Department introduced evidence of severe abuse based on the children's exposure to methamphetamine, which DCS alleged Mother was producing in her home when the children were removed. The Department also indicated that "Mother has done well" since the earlier hearing and asked that Mother be permitted to have unsupervised visitation with the children at DCS's discretion. The court entered a final order that the children were dependent and neglected when they were removed from Mother's home and ordered that DCS would continue to have temporary care and custody of the children. The court took the issue of severe abuse under advisement and allowed Mother to begin unsupervised visitation at DCS's discretion. The court entered an order on December 29, 2016, finding the children were victims of severe abuse pursuant to Tenn. Code Ann.

§ 37-1-102(b)(22)(D).[2] The Department informed the court that Mother admitted that she had "relapsed," and the court ordered that Mother have four hours of supervised visitation weekly with the children.

Mother gave birth to Morgan in November 2016, and the baby tested positive for amphetamine and methamphetamine. Mother tested positive for amphetamine upon her admission to the hospital. The Department filed a petition on December 14, 2016, to adjudicate Morgan dependent and neglected and to transfer her temporary custody to DCS. DCS asserted that Morgan was a victim of severe child abuse due to her exposure to methamphetamines and amphetamines in utero. The trial court held an ex parte hearing and entered a protective custody order that same day. Morgan was placed with Mother's great aunt, alongside her three siblings. On December 16, two days after Morgan was placed into DCS's custody, Mother tested positive for methamphetamines based on an oral swab. On December 22, she tested positive for methamphetamines as a result of a hair follicle test.

The trial court held a preliminary hearing on January 11, 2017, to consider DCS's dependency and neglect petition as to Morgan. Mother was notified of the hearing, but she did not attend. The trial court ordered that Morgan's temporary custody would remain with DCS and that Mother would be permitted supervised visitation with Morgan at DCS's discretion. Mother was ordered to pay child support of $50 per month for Morgan. The court found Morgan to be dependent and neglected and a victim of severe child abuse while in Mother's care and custody in June 2017.

The Department prepared another permanency plan dated January 5, 2017, that covered all the children, including Morgan, and identified the goals as "return to parent" and "exit to kin." This second permanency plan was very similar to the earlier plan. By the time the second plan was prepared, Mother's great aunt's house had become a "fully approved home" for the children's placement. The trial court ratified this permanency plan on May 3, 2017, finding that the plan was reasonable, it included reasonable goals for the children, the responsibilities for Mother were reasonably related to achieving the goals of the plan, and the goals were in the children's best interest.

The Department filed a petition to terminate Mother's parental rights to Seth, Bentley, Kaitlynn, and Morgan on April 27, 2017. The grounds for termination included abandonment by willful failure to support, abandonment by willful failure to provide a suitable home, abandonment by wanton disregard, substantial noncompliance with the permanency plan, severe child abuse, and persistent conditions.

---

[2]The trial court mistakenly referred to Tenn. Code Ann. § 37-1-1-3(22)(d) rather than § 37-1-102(b)(22)(D).

A trial took place on August 24, 2017, during which Mother, a DCS case worker, and Mother's great aunt (the foster mother) testified. The trial court filed an order terminating Mother's rights to the children on December 5, 2017. In its order, the court wrote that it had adjudicated Seth, Bentley, and Kaitlynn dependent and neglected in October 2016 based on Mother's stipulation that the children were dependent and neglected and that it subsequently found the children were victims of severe child abuse due to exposure to illegal drugs while in Mother's care and custody. The court then found that there was clear and convincing evidence to support the grounds DCS included in its petition and that terminating Mother's parental rights was in the children's best interest.

Mother appealed the trial court's order, arguing that the trial court erred in finding (1) there was clear and convincing evidence to support the grounds for terminating her parental rights and (2) that terminating her rights was in the children's best interest.[3]

II. ANALYSIS

A. Standard of Review

The Tennessee Supreme Court has described the appellate review of parental termination cases as follows:

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

---

[3]DCS does not defend the ground of persistence of conditions on appeal, explaining that it failed to wait the requisite six-month period after Morgan was removed from Mother's care before filing its termination petition. *See* Tenn. Code Ann. § 36-1-113(g)(3). A review of the record reveals that DCS is correct in its assertion. Thus, we conclude that the trial court erred in terminating Mother's parental rights based on this ground.

*In re Carrington H.*, 483 S.W.3d 507, 523-24 (Tenn. 2016) (citations omitted); *see also In re Gabriella D.*, 531 S.W.3d 662, 680 (Tenn. 2017).

The termination of a parent's rights is one of the most serious decisions courts make. As the United States Supreme Court has said, "[f]ew consequences of judicial action are so grave as the severance of natural family ties." *Santosky v. Kramer*, 455 U.S. 745, 787 (1982). Terminating parental rights has the legal effect of reducing the parent to the role of a complete stranger, and of "severing forever all legal rights and obligations of the parent or guardian." Tenn. Code Ann. § 36-1-113(l)(1).

A parent has a fundamental right, based in both the federal and state constitutions, to the care, custody, and control of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996) (citing *Nale v. Robertson*, 871 S.W.2d 674, 678 (Tenn. 1994)); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995) (citing *Hawk v. Hawk*, 855 S.W.2d 573, 577 (Tenn. 1993)). This right "is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Carrington H.*, 483 S.W.3d at 521 (citing U.S. CONST. amend. XIV, § 1; TENN. CONST. art. 1, § 8). While this right is fundamental, it is not absolute. *Id.* at 522. The State may interfere with parental rights only in certain circumstances. *Id.*; *In re Angela E.*, 303 S.W.3d at 250. Our legislature has listed the grounds upon which termination proceedings may be brought. *See* Tenn. Code Ann. § 36-1-113(g). Termination proceedings are statutory, *In re Angela E.*, 303 S.W.3d at 250; *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004), and a parent's rights may be terminated only where a statutory basis exists, *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In the Matter of M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

To terminate parental rights, a court must determine by clear and convincing evidence the existence of at least one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re Kaliyah S.*, 455 S.W.3d 533, 552 (Tenn. 2015); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citations omitted). "Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable." *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005).

Once a ground for termination is established by clear and convincing evidence, the trial court or the reviewing court conducts a best interests analysis. *In re Angela E.*, 303 S.W.3d at 251 (citing *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005); *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 2004)). "The best interests analysis is

separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *Id.* at 254. The existence of a ground for termination "does not inexorably lead to the conclusion that termination of a parent's rights is in the best interest of the child." *In re C.B.W.*, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *6 (Tenn. Ct. App. June 26, 2006).

### B. Grounds for Termination

#### 1. Abandonment by Failure to Support

One of the grounds the legislature has determined constitutes a basis for terminating an individual's parental rights is "abandonment," as that term is defined in Tenn. Code Ann. § 36-1-102. Tenn. Code Ann. § 36-1-113(g)(1). Section 36-1-102(1)(A)(i) defines abandonment, in part, as a parent's willful failure to support or make reasonable payments towards the support of a child for a period of four consecutive months immediately preceding the filing of a termination petition. If a parent is incarcerated when the petition is filed, or if a parent is incarcerated during all or a part of the four months immediately preceding the initiation of the termination proceeding, abandonment by failure to support occurs if the parent willfully fails to support or make reasonable payments towards the support of a child for four consecutive months immediately prior to the parent's incarceration. Tenn. Code Ann. § 36-1-102(1)(A)(iv). "Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent." *In re Audrey S.*, 182 S.W.3d at 863. A parent's failure to support is "willful" if he or she has "'the capacity to provide the support, makes no attempt to provide support, and has no justifiable excuse for not providing the support.'" *Dep't of Children's Servs. v. Culbertson*, 152 S.W.3d 513, 524 (Tenn. Ct. App. 2004) (quoting *In re Adoption of Muir*, No. M2002-02963-COA-R3-CV, 2003 WL 22794524, at *5 (Tenn. Ct. App. Nov. 25, 2003)). If a parent's failure to support is out of his or her control, that parent's failure will not be termed "willful." *In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013). Whether a parent failed to support a child is a question of fact, but whether a parent's failure to support a child was willful is a question of law. *Id.*

The legislature presumes a parent who is at least eighteen years old is aware of his or her legal obligation to support his or her child(ren), even if there is no court order requiring the parent do so. Tenn. Code Ann. § 36-1-102(1)(H); *David A. v. Wand T.*, No. M2013-01327-COA-R3-PT, 2014 WL 644721, at *8 (Tenn. Ct. App. Feb. 18, 2014). A parent's failure to support his or her child(ren) during the relevant four-month period cannot be cured by providing support after the termination petition is filed. Tenn. Code Ann. § 36-1-102(1)(F).

The Department filed the termination petition on April 27, 2017. Mother was in jail from sometime in March until the end of May 2017. Because Mother was in jail

when the petition was filed, the relevant four-month period for purposes of Tenn. Code Ann. § 36-1-102(1)(A)(iv) was four months prior to the day Mother went to jail in March 2017.[4] Mother testified at trial that she had no medical or physical conditions that prevented her from working. She testified that she earned money cleaning houses for a few weeks while she was in Arkansas, but the record does not reflect how much Mother earned in that pursuit. Mother also testified that she worked at the Holiday Inn part-time earning $8 an hour for about three weeks before she was incarcerated in March 2017.

The evidence is undisputed that Mother paid nothing towards the support of her children during the relevant four-month period. The only support Mother paid during the pendency of this matter was $400 that her mother gave her to purge herself of contempt in 2017, after the termination petition was filed. The trial court found that DCS proved the ground of abandonment by failure to support by clear and convincing evidence. We disagree. Although the record shows that Mother was aware of her responsibility to pay child support, we find DCS failed to prove by clear and convincing evidence that Mother had the capacity to pay support during the relevant period. "A parent who fails to support a child because he or she is financially unable to do so is not willfully failing to support the child." *In re Audrey S.*, 182 S.W.3d at 864 n.33; *see In re M.J.B. & M.W.S.*, 140 S.W.3d 643, 655 (Tenn. Ct. App. 2004) (finding record lacked evidence that parent "had any disposable resources that she could have used to support her children").

The only evidence in the record regarding Mother's income during the relevant period is that she worked part-time at the Holiday Inn making $8 an hour and that she cleaned houses in Arkansas for a few weeks. We don't know how much she earned cleaning houses. Mother testified that she lived in a tent and in a car following her in-patient treatment and that she lived with family members in Arkansas at the end of December 2016 and the first part of 2017. The record does not include firm dates of when she lived in these various places, and Mother did not testify that she had any money to pay for her living expenses. Without evidence to establish that Mother had the ability to pay support for her children during the relevant time period, we conclude that DCS failed to show by clear and convincing evidence that Mother failed to support or make reasonable payments toward the support of her children to prove the ground of abandonment set forth in Tenn. Code Ann. § 36-1-102(1)(A)(iv). Therefore, we reverse the trial court's termination on this ground.

2. Abandonment by Failure to Establish a Suitable Home

Tennessee Code Annotated section 36-1-102(1)(A)(ii) provides that a parent has abandoned his or her child(ren) by failing to provide a suitable home when:

---

[4]The record does not include the exact dates when Mother entered jail in March 2017 or when she left jail in May 2017.

The child has been removed from the home of the parent or parents or the guardian or guardians as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department.

This statute explicitly requires DCS to make reasonable efforts to help a parent whose children have been removed to establish a suitable home for the children for a period of four months following the children's removal. This Court has found that this statute requires DCS employees to "'use their superior insight and training to assist parents with the problems the Department has identified in the permanency plan, whether the parents ask for assistance or not.'" *In re Matthew T.*, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at \*7 (Tenn. Ct. App. Apr. 20, 2016) (quoting *Dep't of Children's Servs. v. Estes*, 284 S.W.3d 790, 800-01 (Tenn. Ct. App. 2008)); *see also In re Jamel H.*, No. E2014-02539-COA-R3-PT, 2015 WL 4197220, at \*6 n.4 (Tenn. Ct. App. July 13, 2015). A home is not suitable within the meaning of the statute if it is not free from drugs. *In re Matthew T.*, 2016 WL 1621076, at \*7 (citing *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at \*9 (Tenn. Ct. App. June 10, 2014)).

The trial court adjudicated Mother's three older children dependent and neglected on March 29, 2016, and they entered the custody of DCS that same day. Thus, the relevant four-month period for the three older children runs from March 29 through July 29, 2016. Morgan was adjudicated dependent and neglected on December 14, 2016, and she was placed in DCS's custody that same day. Thus, the relevant four-month period for Morgan runs from December 14, 2016, through April 14, 2017.

Mother testified about the different places she lived from the time the children were removed from her house in March 2016 until trial. She continued living in the same apartment where the children were living when they were removed until April 25, 2016, when Mother started in-patient treatment, which continued for forty-five days. Once she completed her in-patient treatment, Mother lived in a tent in a friend's front yard for a few weeks. Then Mother lived out of a vehicle for a week or two. Mother testified that she got pulled over while she was living in the vehicle and was sent to jail for driving on a suspended license. Mother testified that she moved to Arkansas in January 2017, where her family stole her things, and then she was incarcerated from March until the end of May 2017. When she was released, Mother moved into a residence with a friend, but she moved out two or three weeks later because the arrangement was not working out. Mother testified that she began living in a house with a friend shortly before trial and that she was paying $45 a week for rent.

Tammy Lawler is the case worker DCS assigned to Mother's case, and DCS relies on testimony by Ms. Lawler to prove it complied with the requirements of the statute to assist Mother establish suitable housing. Ms. Lawler testified that she "offered to help [Mother] with housing, help her find housing, and she can get that on her own." Ms. Lawler's testimony does not include a timeframe or description of any particular actions she took to assist Mother in this endeavor, however. When Mother was asked whether anyone from DCS helped her obtain housing, she replied that "Miss Mona" told her she was going to speak with someone named Billy Reed, but that Miss Mona never got back to Mother to tell her if she was able to work anything out with Mr. Reed.

The trial court found that Mother had not made efforts to provide a suitable home for her children but that "DCS did make reasonable efforts to assist [Mother] in establishing a suitable home for the children." We disagree with the trial court's determination on this issue and conclude that the evidence does not establish by clear and convincing evidence that DCS proved this ground. Although we agree that Mother was unsuccessful in establishing a suitable home for the children, DCS failed to show that it made reasonable efforts during the relevant four-month periods to assist Mother in obtaining suitable housing, as it must, to prevail on the ground of abandonment by failure to provide a suitable home. "Termination for failure to provide a suitable home requires a finding, supported by clear and convincing evidence, that a parent failed to provide a suitable home for his or her child even after DCS assisted that parent in his or her attempt to establish a suitable home." *In re Jamel H.*, 2015 WL 4197220, at *6. Because DCS did not present sufficient evidence that it assisted Mother to obtain a suitable home, we reverse the trial court's judgment on this issue.

### 3. Abandonment by Wanton Disregard

A parent who was incarcerated when the termination petition was filed can also abandon his or her children, within the meaning of the parental termination statute, by

engaging in conduct that shows a "wanton disregard" for the children's welfare preceding the incarceration. Tenn. Code Ann. § 36-1-102(1)(A)(iv). The statute provides as follows:

> A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and . . . the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child. If the four-month period immediately preceding the institution of the action or the four-month period immediately preceding such parent's incarceration is interrupted by a period or periods of incarceration, and there are not four (4) consecutive months without incarceration immediately preceding either event, a four-month period shall be created by aggregating the shorter periods of nonincarceration beginning with the most recent period of nonincarceration prior to commencement of the action and moving back in time. . . . A finding that the parent has abandoned the child for a defined period in excess of four (4) months that would necessarily include the four (4) months of nonincarceration immediately prior to the institution of the action, but which does not precisely define the relevant four-month period, shall be sufficient to establish abandonment.

Tenn. Code Ann. § 36-1-102(1)(A)(iv). The definition of "child" has been extended to include a developing child in utero for purposes of this ground for termination. *In re F.N.M.*, No. M2015-00519-COA-R3-PT, 2016 WL 3126077, at *3 (Tenn. Ct. App. Apr. 11, 2016); *see also Dep't of Children's Servs. v. Harville*, No. E2008-00475-COA-R3-PT, 2009 WL 961782, at *8 (Tenn. Ct. App. Apr. 9, 2009); *In re S.L.A.*, 223 S.W.3d 295, 300 (Tenn. Ct. App. 2006). Thus, "'[t]he conduct may occur before the birth of the child whose welfare is thereby put at risk.'" *In re F.N.M.*, 2016 WL 3126077, at *3 (quoting *In re Jamazin H.M.*, No. W2013-01986-COA-R3-PT, 2014 WL 2442548, at *9 (Tenn. Ct. App. May 28, 2014)).

The statute does not define "wanton disregard." *In re H.A.L.*, No. M2005-00045-COA-R3-PT, 2005 WL 954866, at *6 (Tenn. Ct. App. Apr. 25, 2005). Tennessee courts have held that "probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.*, 182 S.W.3d at 867-68. "Our courts have consistently held that an incarcerated parent who has multiple drug offenses and wastes the opportunity to rehabilitate themselves by continuing to abuse drugs, resulting in revocation of their parole and reincarceration, constitutes abandonment of the child, and demonstrates a wanton disregard for the welfare of the child." *Dep't of Children's Servs. v. J.M.F.*, No.

E2003-03081-COA-R3-PT, 2005 WL 94465, at *7 (Tenn. Ct. App. Jan. 11, 2005) (citing *In re C.T.S.*, 156 S.W.3d 18, 25 (Tenn. Ct. App. 2004); *Dep't of Children's Servs. v. J.S.*, No. M2000-03212-COA-R3-JV, 2001 WL 1285894, at *3 (Tenn. Ct. App. Oct. 25, 2001); *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000); *G.M.C. v. A.V.I.*, No. E2000-00134-COA-R3-CV, 2000 WL 1195686, at *5-6 (Tenn. Ct. App. Aug. 23, 2000); *Dep't. of Children's Servs. v. Wiley*, No. 03A01-9903-JV-00091, 1999 WL 1068726, at *7 (Tenn. Ct. App. Nov. 24, 1999)). "The actions that our courts have commonly found to constitute wanton disregard reflect a 'me first' attitude involving the intentional performance of illegal or unreasonable acts and indifference to the consequences of the actions for the child." *In re Anthony R.*, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at *3 (Tenn. Ct. App. June 9, 2015).

Courts are not limited to the four-month period preceding a parent's incarceration to determine whether the parent has engaged in conduct evidencing a wanton disregard for his or her children's welfare. *Id.* at *2; *In re F.N.M.*, 2016 WL 3126077, at *3. Incarceration itself is not grounds for a parent's termination of parental rights, but courts consider the incarceration a "triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child." *In re Audrey S.*, 182 S.W.3d at 866.

When DCS filed the termination petition in this case, Mother was incarcerated for driving on a suspended license and failing to appear in court for a hearing. The record shows that the initial referral to DCS was based on a neighbor's report that Mother was using methamphetamine in front of the children and leaving it within their reach. Two of the children subsequently tested positive for methamphetamines and amphetamines. Mother agreed to undergo rehabilitation in an in-patient facility after the children were removed and placed in DCS's custody, but she failed to comply with the recommended follow-up steps and relapsed after successfully completing her treatment. When Morgan was born in November 2016, Mother tested positive for amphetamine and Morgan tested positive for methamphetamine and amphetamine. Morgan was removed from Mother's custody less than a month after she was born, and Mother testified that she started using drugs again before Morgan was removed from her custody. Mother testified that she did not seek further treatment following her relapse in December 2016. Mother was incarcerated at different times during the pendency of this action for reasons related to her driving on a suspended license and failing to pay child support pursuant to the court's orders.

The trial court determined that Mother engaged in conduct that exhibited a wanton disregard for her children's welfare. We agree that the evidence is clear and convincing that Mother's conduct exhibited a wanton disregard for the children's welfare and affirm the trial court's determination as to this ground.

## 4. Substantial Noncompliance with Permanency Plan

In addition to the grounds discussed thus far, a parent's rights can be terminated if he or she is substantially noncompliant with the statement of responsibilities in a permanency plan that complies with the requirements of title 37, chapter 2, part 4. Tenn. Code Ann. § 36-1-113(g)(2). Tennessee Code Annotated section 37-2-403(a)(2) requires that the permanency plan for each child in foster care include a statement of responsibilities between the parent(s), the agency, and the caseworker of the agency; the statements identify each party's responsibilities in specific terms; and the statements be reasonably related to remedying the conditions that necessitated foster care placement. This ground for termination does not require DCS to use reasonable efforts to assist a parent in complying with the requirements of a permanency plan. *See In re Kaliyah S.*, 455 S.W.3d at 555 (holding that "proof of reasonable efforts is not a precondition to termination of the parental rights of the respondent parent"); *see also In re Skylar P.*, No. E2016-02023-COA-R3-PT, 2017 WL 2684608, at *7 (Tenn. Ct. App. June 21, 2017).

The Department developed two permanency plans for Mother, the first in April 2016 and the second in January 2017, after Morgan was born. The first plan identified the permanency goal for Seth and Bentley to be returned to Mother. The permanency goal for Kaitlynn was to exit custody with a relative. The goal target date for all three children was October 25, 2016. The first plan directed Mother to pay $100 each month for the support of each of her three children in DCS custody and included the following concerns: Mother's erratic behavior at visitation with children, Mother's admitted use of pain pills and methamphetamines, Mother's unemployment, and Mother's lack of suitable housing for the children. The plan included a statement of Mother's responsibilities for each concern identified. With regard to Mother's erratic behavior during her visits with the children, she was required to complete a mental health assessment by June 20, 2016, sign releases for the assessments, and follow all recommendations of the mental health assessment. With regard to her admitted use of pain pills and methamphetamines, Mother was to have negative drug screens, submit to random drug screens to include hair, nail, urine, or saliva at the request of DCS, provide medication prescriptions and submit to random pill counts, attend an in-patient treatment facility, follow all discharge recommendations, and sign releases for records and recommendations. With regard to her unemployment, DCS required Mother to obtain a legal source of income, provide proof of income to DCS to establish financial stability, and complete classes and work towards obtaining her General Equivalency Diploma ("G.E.D."). Finally, with regard to her lack of suitable housing, Mother was required to notify DCS when she obtained adequate housing, resolve all legal issues, and provide DCS with four consecutive months of paid rent and utility receipts to prove stability.

Mother participated in the development of the first permanency plan and signed the plan on April 25, 2016. She also signed a statement acknowledging receipt of a copy of the "Criteria and Procedures for Termination of Parental Rights" that was attached to

the plan and that she was provided an explanation of its contents. The trial court ratified the first plan on November 14, 2016. Morgan was included in the second permanency plan dated January 5, 2017. The second plan was substantially similar to the first plan. The second plan listed two goals for each child: "return to parent" or "exit to kin," and the goal target date for this plan was set at July 15, 2017. The amount of monthly child support Mother was to pay for each child was lowered from $100 to $50. In addition to the responsibilities identified in the initial plan, the second plan required Mother to demonstrate her ability to parent the children in an age-appropriate manner by providing a meal or snacks during her scheduled visits with the children and to notify DCS twenty-four hours in advance if she was not able to make it to a scheduled visit. The second permanency plan was ratified on April 20, 2017.

Mother has not substantially complied with her responsibilities under either of the permanency plans. She attended an in-patient treatment facility shortly after the three older children were removed from her custody, but she refused to follow the discharge recommendations. One of the discharge recommendations was that Mother attend ninety AA meetings in ninety days, and Mother testified that she only attended "a couple" of meetings. The record does not reflect that Mother ever had a mental health assessment. When she was asked about this at trial, Mother testified that she was never in the proper mind set to have her mental health assessed.[5] Despite successfully completing the in-patient treatment for drugs and alcohol while she was pregnant with Morgan, Mother tested positive for amphetamine when Morgan was born and she admitted to relapsing following Morgan's birth. The record does not reflect that Mother has sought any further drug and alcohol treatment.

With regard to employment, Mother worked only sporadically and for short periods from the time the older children were removed from her custody in March 2016 until trial. She was unemployed when the children were removed. Mother testified that she cleaned houses for a time while she was in Arkansas and that she worked at a Holiday Inn for about three weeks before she was incarcerated in March 2017 and then for another couple of weeks following her release. Mother also testified that she worked for about three weeks at Tice's Springs in May 2017 and that she worked for a few days at Thunder Alley in August 2017. Mother testified that she had plans to begin working at The Dollar Store following trial, but she was unsure of her rate of pay or how many hours per week she would be working.

Mother failed to maintain contact with DCS during the pendency of her case, as she was required to do. Mother did not inform Ms. Lawler when she moved from place to place in Tennessee or when she relocated to Arkansas following Morgan's birth. She also did not let DCS know when she was working or provide any proof of her income.

---

[5]Mother testified that she went in for a mental health evaluation shortly before trial but was unable to retrieve the results in time for trial.

Mother admitted at trial that she had not paid any amount of child support other than $400 that her mother lent her for the purpose of purging herself of contempt. The record is not clear about when this $400 was paid, but the record suggests Mother paid this amount shortly before the trial, after the termination petition was filed.

Mother failed to comply with her responsibilities related to establishing and maintaining suitable housing for the children. She testified that prior to July 2017, which was one month before trial, she did not have an address. As discussed above, Mother was living in an apartment when the three older children were removed from her custody. Shortly thereafter, Mother began the 45-day in-patient treatment. After leaving the in-patient facility, Mother lived in a tent in a friend's front yard for a few weeks, and after that she lived out of a car. Mother moved to Arkansas in January 2017 for five or six weeks. From March to the end of May 2017, Mother was incarcerated for driving on a suspended license and failure to appear in court for a hearing. Mother began living in a three-bedroom house a few weeks before the trial, but Ms. Lawler testified that Mother did not inform her that she was residing in this house until the day before trial.

Mother's visitation with the children was not consistent. After the children were removed from her custody, Mother was allowed weekly visitation with the children. Ms. Lawler testified about Mother's visitation:

She had weekly visitations and she was about every three weeks. She would miss one week out of the month. And then the one time that she was in [the treatment facility] we brought [the children] up there for 45 days, and then after that it was like two weeks a month until about September, October, and then it was kind of like just a little.

When Mother was asked at trial when she last saw her children, she responded, "I honestly can't tell you." Ms. Lawler testified that Mother last saw her children in early January 2017, before she moved to Arkansas. The trial court allowed Mother to send letters to her children after it removed her right to visit with them. The evidence showed that Mother sent only one letter to the children. Ms. Lawler testified that Mother last spoke with the children in March or April of 2017.

The trial court found there was clear and convincing evidence to support this ground for termination:

[Mother's] own testimony makes it clear that in the initial Permanency Plan and all subsequent plans, there were specific tasks for [Mother] to complete. The criteria for termination of parental rights were explained to [Mother] and she signed the criteria stating she was aware of the requirements and the reasons her parental rights could eventually be terminated. The testimony showed that even though [Mother] was in and

- 14 -

out of jail, during the times she was not in jail she failed to follow through with most of the tasks on the permanency plan. And even though [Mother] was assisted by DCS in many ways, she was not able to obtain a job or stable housing or complete her A&D or mental health treatment. The testimony further showed that DCS used reasonable efforts to try and assist [Mother]; however she would not stay in contact with her caseworker. The testimony further showed that the permanency plans were in the children's best interests and the requirements for [Mother] were reasonably related to remedying the reasons the children were in foster care.

Mother argues the trial court erred in concluding the evidence supported this ground by clear and convincing evidence, pointing out that she had a mental health evaluation performed prior to trial, she obtained housing by the time of trial, she attended rehabilitation for forty-five days in 2016, and she had obtained employment at The Dollar Store. With the exception of the in-patient facility where Mother obtained treatment for her drug and alcohol use in April and May 2016, Mother does not point to any other steps she took to comply with her responsibilities under the permanency plans until after the termination petition was filed. Moreover, Mother relapsed after she completed the in-patient treatment, and the evidence does not show that she sought additional treatment to address her continuing issues with drugs and alcohol. We find Mother's efforts were "too little too late." *See In re Daymien T.*, 506 S.W.3d 461, 473 (Tenn. Ct. App. 2016) (finding father's progress on requirements under permanency plan were "too little, too late" because he "largely failed to take any action for nearly two years after the child was removed from his custody"); *see also In re K.M.K.*, No. E2014-00471-COA-R3-PT, 2015 WL 866730, at *6 (Tenn. Ct. App. Feb. 27, 2015); *In re A.W.*, 114 S.W.3d 541, 546-47 (Tenn. Ct. App. 2003). Our review of the record convinces us that the evidence is clear and convincing that Mother failed to address or complete many of the requirements in the permanency plans. In fact, with the exception of the in-patient treatment, she did not begin to address the requirements until shortly before trial, after the termination petition was filed. Thus, we affirm the trial court's determination that termination of Mother's rights based on her substantial noncompliance with the permanency plans was established by clear and convincing evidence.

### 5. Severe Child Abuse

Parental rights can be terminated upon clear and convincing evidence that a parent engaged in "severe child abuse," as that term is defined in Tenn. Code Ann. § 37-1-102. Tenn. Code Ann. § 36-1-113(g)(4). "Severe child abuse" is defined as:

> The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death; [or]

- 15 -

. . . .

Knowingly allowing a child to be present within a structure where the act
of creating methamphetamine . . . is occurring.

Tenn. Code Ann. § 37-1-102(b)(22)(A)(i), (D).

### Seth, Bentley, and Kaitlynn

The trial court (which was a juvenile court) entered an order on December 29, 2016, finding that Seth, Bentley, and Kaitlynn were victims of severe child abuse pursuant to Tenn. Code Ann. § 37-1-102(b)(22)(D). Mother participated in the dependency and neglect proceedings that preceded the court's determination that the children were victims of severe child abuse, and the court noted that Mother stipulated in those earlier proceedings that the children were dependent and neglected.

Mother did not appeal the trial court's judgment finding the children were victims of severe child abuse, as she had the statutory right to do. *See* Tenn. Code Ann. § 37-1-159(a) ("Any appeal from any final order or judgment in a[] . . . dependent and neglect proceeding, filed under this chapter, may be made to the circuit court . . . [and] shall be perfected within ten (10) days . . . following the entry of the juvenile court's order."). The doctrine of res judicata applies to bar the re-litigation of an issue under the following circumstances:

an existing final judgment rendered upon the merits, without fraud or collusion, by a court of competent jurisdiction, is conclusive of rights, questions and facts in issue as to the parties and their privies, in all other actions in the same or any other judicial tribunal of concurrent jurisdiction.

*Galbreath v. Harris*, 811 S.W.2d 88, 90 (Tenn. Ct. App. 1990). Because Mother did not appeal the trial court's earlier order regarding severe child abuse of the older three children, the issue of whether Mother's parental rights can be terminated as to Seth, Bentley, and Kaitlynn on the ground of severe child abuse is res judicata. *See In re Heaven L.F.*, 311 S.W.3d 435, 439 (Tenn. Ct. App. 2010) (holding that doctrine of res judicata precludes parent from re-litigating issue of severe child abuse in termination proceeding when court has found child to be victim of severe child abuse in earlier dependency and neglect proceeding); *see also Dep't of Human Servs. v. Tate*, No. 01-A-01-9409-CV-00444, 1995 WL 138858, at *5 (Tenn. Ct. App. Mar. 31, 1995).

### Morgan

The trial court filed an order finding Morgan was a victim of severe child abuse on August 23, 2017, just one day before the trial to determine whether Mother's parental

rights should be terminated. It is unclear whether Mother appealed that order. In its order terminating Mother's rights, the trial court again concluded that Mother committed severe child abuse against Morgan. The record shows that Mother tested positive for amphetamine and Morgan tested positive for methamphetamine and amphetamine when she was born. We have held in prior cases that "a mother's prenatal drug use constitutes severe child abuse 'whether or not the child actually sustains harm.'" *In re Douglas H.*, No. M2016-02400-COA-R3-PT, 2017 WL 4349449, at *9 (Tenn. Ct. App. Sept. 29, 2017) (quoting *In re Shannon P.*, No. E2012-00445-COA-R3-PT, 2013 WL 3777174, at *5 (Tenn. Ct. App. July 16, 2013)); *see also In re M.J.J.*, No. M2004-02759-COA-R3-PT, 2005 WL 873305, at *8 (Tenn. Ct. App. Apr. 14, 2005) (affirming trial court's finding that Mother's drug use while pregnant constituted severe child abuse for purposes of terminating her parental rights).

In its order terminating Mother's parental rights, the trial court found the evidence showed that Mother knowingly exposed her children to drugs and that the children tested positive for methamphetamines and amphetamines. Thus, the trial court concluded, clear and convincing evidence supported terminating Mother's parental rights based on the ground of severe child abuse. Mother does not contest this ground as a basis for terminating her parental rights. We find the trial court properly determined that the evidence was clear and convincing that Mother committed severe child abuse against Morgan before Morgan was born and that the issue of whether Mother committed severe child abuse against Seth, Bentley, and Kaitlynn is res judicata.

## C. Best Interests Analysis

Having found clear and convincing evidence exists to terminate Mother's parental rights, we next consider whether the trial court properly determined that termination is in the children's best interest. *See* Tenn. Code Ann. § 36-1-113(c)(2); *In re Audrey S.*, 182 S.W.3d at 860. "Facts relevant to a child's best interests need only be established by a preponderance of the evidence, although DCS must establish that the combined weight of the proven facts amounts to clear and convincing evidence that termination is in the child's best interests." *In re Carrington H.*, 483 S.W.3d at 535 (citing *In re Kaliyah S.*, 455 S.W.3d at 555).

The factors a trial court is to consider in determining whether terminating a parent's rights to a child is in the child's best interests are set forth in Tenn. Code Ann. § 36-1-113(i) and include the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

The Tennessee Supreme Court has addressed the steps DCS must take to reunify a family before a court will terminate a parent's rights, explaining:

[I]n a termination proceeding, the extent of DCS's efforts to reunify the family is weighed in the court's best-interest analysis, but proof of reasonable efforts is not a precondition to termination of the parental rights of the respondent parent. As with other factual findings made in connection with the best-interest analysis, reasonable efforts must be proven by a preponderance of the evidence, not by clear and convincing evidence. *In re Audrey S.*, 182 S.W.3d at 861. After making the

underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest. *See In re Adoption of Kleshinski*, No. M2004-00986-COA-R3-CV, 2005 WL 1046796, at *17 (Tenn. Ct. App. May 4, 2005) (citing *In re M.J.B.*, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004)); *see also In re Giorgianna H.*, 205 S.W.3d at 516; *Tenn. Dep't of Children's Servs. v. T.M.B.K.*, 197 S.W.3d 282, 288 (Tenn. Ct. App. 2006).

*In re Kaliyah S.*, 455 S.W.3d at 555-56.

The trial court in this case concluded that after considering all of the testimony and statutory factors set forth in Tenn. Code Ann. § 36-1-113(i), the evidence was clear and convincing that terminating Mother's parental rights was in the children's best interest. The court wrote:

[Mother] has not made such an adjustment of circumstances, conduct or conditions to make it safe and in the children's best interest to be in the home of the parent as she has not obtained and maintained a suitable home for the children; has not obtained mental health treatment; has not completed A&D treatment; and has continued to test positive for illegal drugs. She is not in a position to assume care or custody of the children and will not be for a long time. [Mother] was late to Court for this hearing, not just the morning session, but the afternoon session as well, which speaks volumes as to her concern and disregard for this case.

[Mother] has not made a lasting adjustment after reasonable efforts by the Department that lasting change appears possible. The conditions that led to the removal are not likely to change, and it appears to this Court that [Mother] is going to continue in those conditions.

[Mother] has had little or no contact or relationship with the children, even when [she] was not incarcerated. At one time there was a relationship, but in the past several months [Mother] has [not] been willing to establish a relationship.

Based on the testimony of the caseworker and the custodian, the Court finds that the children are in a good home together that is very stable. When all the factors are evaluated in conjunction with the testimony, the Court finds by clear and convincing evidence that termination is in the best interest of the minor children.

- 19 -

"[A]scertaining a child's best interests in a termination proceeding is a fact-intensive inquiry requiring the courts to weigh the evidence regarding the statutory factors, as well as any other relevant factors." *In re Audrey S.*, 182 S.W.3d at 878 (footnote omitted); *see also White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Conducting a best interest analysis does not call for a "rote examination" of each of the factors listed in Tenn. Code Ann. § 36-1-113(i) and then determining whether the sum of the factors weighs in favor of the parent or not. *White*, 171 S.W.3d at 194. Rather, "[t]he relevancy and weight to be given each factor depends on the unique facts of each case." *In re Audrey S.*, 182 S.W.3d at 878. Courts must view a child's best interest from the child's perspective, not that of the parent. *Id.*; *see also White*, 171 S.W.3d at 194.

In this case, Mother testified at trial that she was not then ready for her children to be returned to her. She explained:

> I'm not asking for you all to give them back to me at this time, I'm just asking for you to let me be a part of their lives. I know they're completely stable and living right with Aunt Cathy, but I know in my heart that I can get myself together and I can get a home for them and bring them home. It's going to take a lot of saving up money because I don't want to bring four kids over to live with me while I'm struggling. I want to have the money to take them and get them anything that they ask me for, and at this time I can't do that. I probably can't do that for another six months. But I can work as hard as I can towards that.

The record shows that by the time of trial, Mother was working towards adjusting her circumstances, conduct, and conditions to create a safe environment for the children to live with her, but she was not yet ready for the children to be with her.

Ms. Lawler testified that she encouraged Mother to undergo a mental health assessment throughout the pendency of this case, but Mother consistently refused to comply. Mother testified that she went in for a mental health assessment shortly before trial, but she did not have the results back in time for trial. Mother admitted that after Morgan was born, DCS encouraged her to "go back to rehab" because she had relapsed and started using illegal drugs again, but Mother did not seek additional treatment. Ms. Lawler testified that she transported the children to see Mother when Mother was in the in-patient treatment facility and that she encouraged Mother to visit the children regularly following this forty-five-day period. Ms. Lawler also testified that she visited Mother while she was in jail to boost Mother's morale and let her know Ms. Lawler was thinking about her. Mother admitted that she failed to maintain contact with Ms. Lawler, and this made it difficult for Ms. Lawler to obtain drug screens from Mother during the pendency of the case.

Although the evidence shows Mother visited the children about three out of every four weeks once she left the in-patient treatment facility in May 2016, Ms. Lawler testified that Mother did not visit the children much after September or October of that year. Mother could not say at trial when she last saw her children, and Ms. Lawler testified that she did not believe Mother had seen them since early January 2017, which was over seven months prior to trial.

We have already addressed Mother's neglect of the children through her exposure of them to amphetamines and methamphetamines and her inability to show that she can provide them with a suitable home or financially take care of them. When the children were removed from Mother's custody in March 2016, they were placed with Ms. C., who is Mother's aunt. Ms. Lawler testified that the children love Ms. C. "as if . . . she was their mother." Ms. Lawler said the younger two children seem to treat Ms. C. as if she was their mother and that the older boy, Seth, "is angry because he knows he has a mother, but somebody else is taking care of him." In response to a question about whether Seth had indicated whether he wanted to see his mother, Ms. Lawler stated:

> He hasn't brought her up. I have tried talking to him about it, but he doesn't want to talk about it and I don't want to push him. But I have been at the house a couple of times when she was having phone calls and it was a fight to get him to talk to her on the phone.

Ms. Lawler explained that Bentley "went through an aggressive spell" but that he has calmed down with the help of counseling. Ms. Lawler testified that she believed removing the children from Ms. C.'s home would be detrimental to them.

Ms. C. testified that the children were doing well in her home and that she was able to transport the children to doctor's appointments and transport Seth and Bentley to meet with their counselors. Ms. C. said that the boys were both doing well in school and that the girls, who were too young for school, were able to stay at home with her. Ms. C. believed "it would be devastating" if the children were removed from her home. Ms. C. testified that she was willing to adopt all four of Mother's children if they became available for adoption.

We agree with the trial court's determination that the evidence clearly and convincingly shows that termination of Mother's parental rights is in the children's best interest. Accordingly, we affirm the trial court's judgment terminating Mother's parental rights to Seth, Bentley, Kaitlynn, and Morgan.

### III. CONCLUSION

We reverse the trial court's judgment that DCS proved by clear and convincing evidence that Mother abandoned the children by failing to support them or provide a

suitable home, and we vacate the judgment that DCS proved the ground of persistence of conditions. We affirm the judgment of the trial court in all other respects. This matter is remanded with costs of appeal assessed against the appellant, Ashley R., and execution may issue if necessary.

_____

ANDY D. BENNETT, JUDGE